## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | |
| v. | **Case No. 21-cr-185 (RDM)** |
| **CHRISTOPHER MOLINA-GARCIA,** | |
| *Defendant.* | |

## MEMORANDUM IN AID OF SENTENCING

## Introduction

Christopher Molina-Garcia respectfully submits the following sentencing memorandum for the Court's consideration. For the reasons stated below, Mr. Molina-Garcia requests the Court impose the sentence agreed upon by the parties, pursuant to Rule 11(c)(1)(C), sixty-six months of incarceration followed by three years of supervised release.

## Background

Christopher was born into tragedy. When he was only a newborn, his father, a police officer, was beaten to death by those he entrusted with his very life, his fellow officers. The full circumstances of what brought such a horrific end to his father's life have always evaded him. Shortly after his father's death, Christopher and his mom moved in with his grandparents, a move that was prompted by both safety and economic concerns. Christopher's grandparents were in the seafood business, which allowed them to help with the family's most basic needs. Although he does not have many fond memories of his childhood, one that remains with him is the image of fishermen bringing his grandparents the fresh catch of the day. Those were the days when his family had the best dinners.

Although his mother tried her best, her income as a police officer was not sufficient to avoid the economic struggles that continued to plague the family. Given her husband's death, safety also continued to be a concern. All of this culminated with Christopher's mom making the incredibly difficult decision of leaving her family in order to come to the United States. Christopher was only five years old.

1

While in the U.S., his mom was able to provide more economic support for the family. Back home, however, things were becoming more and more complicated for Christopher. The older he became, the more pressure the local gangs put on him to join their ranks. He was constantly harassed, and when that did not work, violence became the tool of persuasion. Simply coming home from school became an obstacle course as Christopher was routinely assaulted or robbed. The situation became even worse after a particular incident involving his grandparents. While running from the police one evening, members of the local gang ran in his grandparents' home looking for a place to hide. Christopher's grandparents, unwilling to be involved in any way, put them out on the street—a decision that proved costly.

Eventually, Christopher's mom returned home and quickly arrived at the realization that his life was in danger. At only thirteen years old, when children his age are focused on school and sports, Christopher was forced to make the arduous journey to the United States. A plight that he endured completely alone.

After several months in a U.S. detention center, Christopher connected with his aunt and uncle, who were able to provide housing for him in the District. As is often the case in these situations, Christopher soon realized that he overstayed his welcome. As he got older in his teenage years, it became more and more difficult for his aunt and uncle to support him financially. Still a teenager, he dropped out of school and went to Indiana sight unseen to look for work. Christopher felt not just an obligation to take care of himself, but also to help provide for his family back home.

While in Indiana, Christopher worked at a commercial dairy farm. The work was hard, the hours were long, and his wages were almost nonexistent. And of course, he was still a child. Unsurprisingly, it was not long before he returned to the D.C. Metropolitan area. Upon his return, he tried his best to remain employed. He worked at several restaurants in the city, including Founding Farmer's, Barrel, and Via Sophia at the Hamilton Hotel. Most recently, he worked for a contractor.

Although he was back in D.C., he could no longer stay with his aunt and uncle. With no real family support and still a teenager, Christopher was incredibly isolated at a time where he desperately needed his family. Vulnerable and alone, he found himself turning to the streets for a support system. In turn, he became associated with the very people he fled from when he was thirteen years old. The regretful decisions that will follow Christopher for the rest of his life because of these associations are not lost on him. He understands that his actions have consequences and he accepts responsibility for his involvement in this matter.

Christopher's only focus now is on closing this chapter of his life and beginning the path to turning things around. At barely twenty-one years old, he understands he has the rest of his life ahead of him. While the government's decision to charge this case in District Court as opposed to Superior Court deprives Christopher of consideration for the Youth Rehabilitation Act, the logic of the Act remains the same. Like many other recipients of the Act, he is a young person who still has the full potential to return to the community and become a productive member of society.

## Sentencing Legal Framework

As a Maryland District Court aptly explained, "[t]he sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in a prison cell." *United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at \*1 (D. Md. Feb. 18, 2020). And, "[f]or him, every day, month and year that was added to the ultimate sentence will matter." *Id*.

This concern exists "whether it is the newly incarcerated individual's first experience with incarceration or just the most recent," because regardless, "he must quickly adapt to the stunning loss of freedom and privacy while struggling to maintain any sense of his personal dignity." *Id*. Thus, the court continued, "it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Id*

With this idea at the forefront, the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)). To achieve this goal, the sentencing court must consider, among other things, the history and characteristics of the person to be sentenced, the need for the sentence imposed to serve the purposes of sentencing, and the kinds of sentences available. *Id*. § 3553(a)(1).

Congress has further provided that:

4

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

18 U.S.C. § 3582(a) (emphasis added).

When sentencing a person, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).

The D.C. Circuit has emphasized "that the Guidelines are truly *advisory*." *United States v. Gardinelli*, 545 F.3d 1089, 1096 (D.C. Cir. 2008) (emphasis in original). The Court in *Gardinelli* noted that the Supreme Court's decision in *Gall* gave "district judges *even more* discretion and authority." *Id.* (emphasis in original). Indeed, the Court in *Gardinelli* pointed out that in *Gall,* the Supreme Court affirmed a probationary sentence for a person whose guidelines range was 30 to 37 months. *Id.* at 1095.

## Discussion

### A. Christopher's History and Characteristics

There is little question that the conduct that brings Christopher before this Court is attributed, at least in part, to his youth. Indeed, his adolescence matters a great deal. At the time of the offense, Christopher had just turned *eighteen years old*—an age where his brain is not fully developed.

The Supreme Court has recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). The Court has concluded that, because of these qualities, juveniles "have diminished culpability and greater prospects for reform." *Id*.; *see also Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

Research shows that "psychosocial capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood."[1] Thus, "young adults simply do not have the physiological capacity of

---

[1] James C. Howell et al., *Bulletin 5: Young Offenders & an Effective Response in the Juvenile & Adult Systems: What Happens, What Should Happen, & What We Need to Know*, Doc. No. 242935,

adults over age 25 to exercise judgment or control impulses,"[2] and it is "difficult to justify applying permanent or long-term sanctions to young offenders," including young adults in their early twenties.[3]

The Court should consider not just Christopher's young age, but also the traumatizing and difficult upbringing he experienced as a child. As explained above, his childhood was one that was dominated by fear. This same fear forced him to abandon the only family he knew and go on a perilous journey to a foreign country—where he soon realized just how alone he was.

Despite this adversity, Christopher is focused on what the future holds for him. He is adamant about completing his high school equivalency exam and taking advantage of any rehabilitative programs available to him. Upon his return to the community, he wants to further his education, find stable employment, and reconnect with his family and loved ones.

### B. The Need for the Sentence Imposed

#### a. The COVID-19 Pandemic

The advent of the COVID-19 pandemic has affected sentencing decisions in a marked way. It has altered the landscape for sentencing in every conceivable manner. 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to

---

at 17, Papers From the Study Group on Transitions From Juvenile Delinquency to Adult Crime, Nat'l Inst. Of Justice, U.S. Dep't of Justice (July 2013) (unpublished) (citation omitted).

[2] *Id.* at 18.

[3] Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Justice, U.S. Dep't of Justice (May 2014) at 2.

accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)). With the pandemic, it is necessary to examine this statutory provision in a more deliberate way. An extended period of incarceration for Christopher, when he has little to no access to communication, programming, or rehabilitative resources and faces continued risk to his health is not necessary to meet the goals of sentencing. Indeed, it will have the opposite effect of rehabilitation.

This Court should consider the added punishment COVID-19 has had on persons who are incarcerated when constructing an appropriate sentence. Adding COVID-19 to the mix has resulted in prisons and jails that are even more dangerous, inhumane, and deadly than before. Plainly put, because of the COVID-19 pandemic, Christopher's incarceration has been markedly different from ordinary times; his confinement has been necessarily more severe and contained the added anxiety of contracting a deadly virus.

    *b. Deterrence*

One of the purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B). Here, the conviction and requested sentence provide sufficient deterrence—a longer sentence will not have a deterrent effect on Christopher or others. While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2. Research shows conclusively that "[t]he *certainty* of being caught is a vastly more

powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original). Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21. *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.").

## Conclusion

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Molina-Garcia respectfully requests that the Court impose a sentence of sixty-six months. Additional incarceration, in this case, does nothing to further the ends of justice.

Respectfully submitted,

A.J. Kramer
Federal Public Defender

*/s/*
Jose A. German
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004

9